Good morning, Judge Branch and I are delighted to welcome Judge Rustani back to the Eleventh Circuit. I say back because Judge Rustani sits with us from time to time. I've had the pleasure of sitting with Judge Rustani several times. She hails from the United States Court of International Trade. Judge Rustani, we're happy that you're able to come and visit with us this week and assist us in deciding these cases. Judge Rustani Well, thank you for being so welcoming. Judge Branch And we have four that are scheduled for argument this morning and the first is United States of America v. David Roberson and I see Mr. Roth is here for Roberson. Mr. Das is here for Gilbert and Mr. Haspel is here too for Mr. Roberson. Mr. Krishna is here for the United States. You ready to proceed, Mr. Roth? Judge Rustani Yes, thank you. May it please the Court, Yakov Roth for Ellen David Roberson. Your Honors, what the jury could have concluded in this case is that the defendants hired Oliver Roberson's foundation because they believed that Roberson's name, his reputation, his credibility, his political connections could help them shift the public debate in their fight against an overreaching federal agency. Now, maybe that's unethical. Maybe that violates some Alabama rules governing the conduct of public officials. But the Supreme Court has been clear that the federal bribery statutes are not all-purpose ethics codes for state and local officials. And this conduct was not federal bribery because the defendants did not pay Roberson for the powers of his office, his legislative powers. At most, the jury could have found that they paid him to attend a meeting and ask some questions and to make a public statement. Did they pay him to vote on Resolution 97? Wasn't that an official act that Mr. State Representative Roberson performed in return for the money that was given to his foundation? It was an official act, Your Honor. It was not an official act that the jury could have concluded was part of the agreement with the defendants. And so, I just want to separate out. There are two different pieces to this case. The first piece is these two meetings, and then the second piece is the vote. And I think they present different issues. With respect to the meetings, which are the first two acts, the ones that are discussed with the defendants, where there's coordination, where they're close in time to the hiring of the foundation, the problem there is that those acts are not official acts under McDonnell and they're not acting as... But what's the answer to my question? How about his vote on Resolution 97? Is that an official act? Why can't a jury determine beyond a reasonable doubt that that's an official act by State Representative Roberson? So, the jury definitely could have found that it was an official act. And you only need one, right? You only need one for sufficiency purposes. However, what the jury could not have found beyond a reasonable doubt is that the defendants had paid Roberson to take that vote, and that's true for a few reasons. First of all, unlike the two meetings, it's undisputed in the record there was never any discussion between the defendants and Roberson about legislative activity at all. I thought Roberson testified at the trial that I considered this money a bribe. He did, and he said that was because he was paid, in his view, to talk to people, talk to neighborhood leaders, talk to church leaders, talk to residents, talk to other politicians about the EPA's initiatives and the concerns that Drummond had with them. In fact, he did not say, he never testified that he was paid for legislative activity. In fact, he testified he had never discussed any legislation, including SJR 97, with the defendants. This resolution came up months and months after he was hired, well, after his foundation was hired. And, in fact, it's undisputed in the record from both sides that Roberson had told the defendants he would not vote on any matters that implicated the foundation's partners because of conflict of interest rules. Let me ask you this. We have a different statute than McDonnell. McConnell? McDonnell. McDonnell, yes. Why do you think we need, quote, an official act of the same nature as in that case? And what makes an act an official act? I'm asking a compound question. Sure. Let me take the first part of it first, Your Honor. Yes, Section 666 is different. It uses different words than Section 201. However, the words that it does use are, you have to be paying a state agent in connection with state business. And we think interpreting those terms, consistent with the constitutional principles and the canons of construction that McDonnell applied to Section 201, lead you to a similar place, which is you're not acting as a state agent on state business unless you are somehow exercising state authority. You're not acting as an agent of the state when you just simply make a statement or have a meeting or make a phone call. If you were to construe those terms more broadly, you'd reach the conclusion that what Governor McDonnell did, in fact, violated these statutes. And the only problem in that case was that they had charged the wrong statute. I don't think that's consistent with the principles that the McDonnell decision applied. I thought McDonnell, they made it pretty clear that if they had charged it differently, they might have gotten him. Well, I don't think that's correct. I think there were ways they could have argued the case differently. In other words, they could have said that Governor McDonnell had used his office to pressure the subordinate officials. That would have perhaps led to a different result. What if he was the Speaker of the House of Representatives?  Your Honor, no, I don't think it turns on, I don't think that changes the fact that you need to be paying in some way for an exercise of state power. Now, what McDonnell said was that that includes using your office to advise another official to take an official act. If you know and intend... But was there a role that the Alabama State Legislature had to play in determining whether or not the Superfund site was going to be placed on the national priorities list? The legislature did not have a role. The agency ADEM was tasked with that, by the governor, with that role of deciding whether to concur. What agency? ADEM, Alabama Department of Environmental Management. So the state legislature had no role whatsoever? The state legislature had no role in that determination. And what... And there's some, like, there was a need for some assurances from the state to proceed with the requirement? So there's the concurrence and then there's the issue of whether the state will fund 10% of the cleanup costs. That was never a subject of anything that Oliver Robinson ever talked about with anybody, the state funding. I mean, that may present a different issue if he had said, I'm taking the position, I'm going to vote to deny the 10% cleanup costs. That may be different, but he never did that. All he did at the meeting with EPA was ask a few basic questions. All he did at this commission hearing was sort of make a general statement, but taking a public position on an issue the courts have held after McDonnell does not satisfy the McDonnell test for official action, or I would say the Section 666 analog to that. Does the fact that the agreement between your client and the legislator had a provision that said the legislator is obligated to comply with all laws, does that in any way protect your clients for this resolution? I think it does, because I think it confirms that everyone understood this was not intended to touch his legislative activity. Remember, these are part-time legislators. They all have outside work and there's nothing wrong with that. The problem is if you then stray into the domain of official powers, and not only had they never talked about anything legislative-related, they actually put in the contract that he would comply with applicable laws, and he told them that he would not vote on any matters that touched the foundation. And I think that, for the same reasons as in the Silver decision from the Second Circuit, released just last week, where they said this resolution that was voted on after the fact that affected the donor, that didn't mean that the prior payments had been bribes. We have the same principle applies here to say, no, the resolution can't sustain these convictions. And then we're left with these meetings, and those meetings are simply not official action under the statutes. I wanted to ask him a question about that. Okay. Are you pressing the severance argument? Mr. Asbil is going to be addressing the severance argument, because it's the distinct. Thank you. Thank you, Your Honor. All right. Mr. Doss, you're here on behalf of Mr. Gilbert. Is that right? Yes, Your Honor. May it please the Court. Jeff Doss on behalf of Appellant Joel Gilbert. In this case, the district court constructively amended the indictment by unconstitutionally broadening the factual basis on which the jury could convict. I actually didn't get that. It seemed to me more that you were arguing that a legal theory had been changed. What facts were added? Yes, Your Honor. It's the retainer theory. That's just a theory. I mean, what facts were added? In regard to that, Your Honor, in the district court's jury instructions, it advised the jury that in addition to convicting based on payment in exchange for the three specific actions, alternatively, the jury could convict based on payment in exchange for placing Mr. Robinson on retainer. So this was a divergence from what was actually charged in the indictment. Well, on retainer to do something. It could be, but no actual specific official action need be completed under the retainer theory. So it's a lesser burden for the government if the jury is allowed to consider the retainer theory. The way Count II is structured, it locks the government into the three discrete official actions. And we know this from this court's decision in United States v. NAROG. In that case, it was a drug offense. The defendant was charged with having possessed pseudoephedrine with the intent to manufacture a controlled substance. That is methamphetamine. The government here followed that same charging language. It used the general statutory language that we find in Section 666. So your argument is that the indictment has to use the words retainer theory? Your Honor, even if the indictment has alleged retainer theory as the government claims, that language appears in Count I, the conspiracy count. By the time we get to Count II, we have the general statutory language. We have a that is, and then we have the three discrete acts, the meeting with the EPA. How do you get around United States v. Keller where we said in 1990 you don't have to use those words in the indictment? The retainer theory, Your Honor? Even if we assume that the retainer theory has been alleged, the way Count II is structured, it excludes the retainer theory by limiting it to just those three specific acts, payment in exchange for meeting with the EPA, payment in exchange for speaking to the AEMC, and payment in exchange for SJR 97. So even if the retainer theory is alleged, if we assume it's alleged in Count I, the conspiracy count, by the time we get to Count II, the substantive count, it's been excluded by the that is language. And that comes from United States v. NAROG, United States v. Weisman as well. In both of those decisions, there was something specific alleged in the substantive count. By the time it got to the jury, though, the district court instructed on something different than what followed the that is language in the substantive count. Even if it is consistent with the broad understanding of the statute, it's still a constructive amendment by allowing the jury to convict based on anything other than what follows that that is language. And so here, the jury was told not only could it convict based on belief or evidence that the defendants had paid Oliver Robinson in exchange for the performance of the three actions, but also could convict based on payment in exchange for placing him on a generalized retainer without the actual completion of any official action. That lessened the government's burden, and it constructively amended the indictment. In addition, the district court erred by declining to instruct the jury in this case that advice must flow from an official's duties. Instead, the jury instructions simply provide that all the jury had to find was that Oliver Robinson was paid to give advice in a general sense without regard to whether it flowed from his official duties. That instruction lessened the government's burden and is inconsistent with McDonnell and Birdsall. First, the government admitted to the district court pre-trial that Oliver Robinson's actions with respect to the AEMC and the meeting with the EPA flowed from his official duties. In fact, in opposition to the motion to dismiss the indictment, the government took that position, that official duty is the test for whether the action is official or not. The government succeeded with that argument before the district court. But by the time we get to the jury instructions in this case, the government opposed any inclusion of qualifying advice with whether it flows from official duty or not. But wasn't Robinson attending these meetings in his capacity as legislator? There's a distinction, Your Honor, between capacity and official duty, and that's the distinction that McDonnell drew. In that case, the government urged the Supreme Court to affirm the conviction because McDonnell was acting in his official capacity when he was engaging with various members of government. The Supreme Court said capacity is not enough. What we have to focus on is the exercise of formal governmental power. Official duty takes into account whether there has been an exercise of governmental power, more so than just appearing in one's capacity as a legislator. Didn't the district court use the precise instruction from the McDonnell case? They quoted the McDonnell case? Your Honor, the district court in the instruction used the pattern instruction, which is modeled after the language in McDonnell. Okay. All right. If I may add to that, Your Honor. Our position is that instruction, though it is correct in a general sense, fails to qualify it with important language. That advice is not just the generalized, everyday understanding of the term, but instead it has a technical meaning, and we get that meaning from the Birdsall decision. Okay. All right. Thank you, Mr. Dodds. Thank you. Mr. Haskell. Thank you, Your Honor. May it please the Court. Our defense theory in this case, which applied to all counts, was good faith reliance on the advice of expert counsel. Twenty-one Balsh timekeepers billed over $1.7 million during the course of this project defending Drummond against the EPA. And the quarterback of that team at Balsh was Joel Gilbert, our co-defendant who led all aspects of the defense, and he provided detailed billing reports of everything he did to in-house Drummond lawyers. We believed that Mr. Gilbert had been negligent in terms of sufficiently protecting the client, but that he would not admit that in his own criminal trial, where not only his license but his liberty were at issue. We asked for severance pretrial. We weren't precisely sure how everything would play out during the course of the trial, but in any event, we forecast that there would be prejudice by the joinder of a lawyer and his client in this context. Can I ask, at the beginning of trial, what did you tell the judge? Did you tell him that Mr. Roberson wanted to testify? No, we didn't tell him that he wanted to testify. We basically told him that we weren't exactly sure how this prejudice was going to play out, but we had hoped if we got a severance and the lawyers proceeded first, that we would be able to call them in our own defense. Okay. Mr. Gilbert testifies, right? He did. He testifies. He gave this advice, right? The only thing that's missing is testimony of reliance. Personal reliance. Okay, and so? That's an element of our AOC defense. I know, but you never told anybody you wanted to put him on the stand. How is he going to prove reliance without testifying? I'm sorry? How would he prove reliance without testifying? I'm trying to figure out the prejudice here. By the admission of the second portion of the paragraph in the 302 interview of my client that talks directly about my client talking with Mr. Gilbert and Mr. Gilbert reporting that he had spoken with ethics experts and government relations experts at Balch, that what they were doing was okay. Okay, Judd, I understand now what you're saying. It's an inference to be drawn from the fact that the advice was given. But we know the advice was given. There's other testimony. Yes, we know he gave advice to counsel, but he doesn't say that he gave advice directly to my client. The government argues that he only gave advice directly to the CEO of Drummond, Mike Tracy, but not personally to my client, and that it was unfair for my client to try to indirectly rely on that because the government contended that there already, before the meeting with Mike Tracy, was in place a conspiratorial agreement with Oliver Robinson, thereby making, theoretically, the report to Mike Tracy a joke. When he says that they've already checked, when Mr. Gilbert says he's checked with his ethics experts, etc., and not only is hiring the legislator legal, but it is ethical as well. I say that my time is up. Thank you, Mr. Haspel. We'll hear from the government. Mr. Krishna. Thank you. May it please the Court, Praveen Krishna for the United States. The central question before the jury was whether the defendants paid Oliver Robinson to use his official position to protect the Drummond Company from Superfund liabilities. As McDonnell makes clear, this is a highly fact-intensive question, and in this case the government put on close to 30 witnesses and nearly 300 exhibits. The verdicts in this case reflect nothing more and nothing less than the defendants' factual guilt and aren't the result of any legal error. With this Court's permission, I'll begin by discussing McDonnell issues that have been raised and then move to the retainer and the severance-slash-mistrial issues that have been discussed. So starting with McDonnell, I think it's important to note at the outset, as Judge Rastani pointed out, that these arguments affect only the honest services fraud counts.  McDonnell is not a general discourse on the nature of bribery. It is a statutory interpretation of Section 201A3's definition of official act. And looking at the sufficiency of the evidence for the honest services fraud counts, the defendants face three basic problems. The most obvious problem is SJR 97. There is certainly enough evidence for a reasonable juror to conclude that Oliver Robinson was paid to vote to move that resolution forward to the House floor. He, in fact, testified that— Is there any evidence in the record that Robinson discussed the resolution with Roberson or Gilbert? There is no evidence of that, Your Honor. There is evidence, however, that Mr. Robinson testified, I believe, at pages 1867 to 1868, that he understood his relationship with the defendants to encompass his legislative role and his votes. And more to the point, at the time he cast this vote, he had been paid $21,000 under a contract for community outreach in which the only community outreach that took place was roughly the distribution of 93 letters. And he had appeared before the AEMC, the Alabama Environmental Management Commission, in a meeting where he had initially expressed concerns about the politics of his appearance and then shortly afterwards was rushed a payment for $14,000. Well, they say all he did was give advice now, right? That's what they said, and that's not enough in order to constitute an official act. And so when we look at the Supreme Court's opinion in McDonald, they're looking for something a little more than that, it seems. They say, I mean, he didn't set up any meetings. He didn't talk to any other officials. He didn't organize any events. Without more, how does that fit within the definition of an official act? Just giving advice? McDonald says that giving advice, knowing or intending that an agency will rely on that advice, is an official act. And it gives the example of— Does McDonald use the word giving advice? It says providing advice. And so that is, I believe the defendant's argument is that Mr. Robinson wasn't even providing advice. He was simply asking basic questions. But as the testimony makes clear, the theory that we're traveling under is that Mr. Robinson, as a state legislator, is in a unique position to give advice that these state and environmental agencies would rely upon. As a state legislator, too, he's in a unique position because he's a part-time legislator, correct? That's right. So state legislators in a state where it's just part-time typically have businesses outside of their duties as state legislators. That's correct, Your Honor. So what I'm looking at is we have these two meetings, and then we have the resolution, which are the theories you're traveling under. If Robinson, for the two meetings, had disclosed, hey, I'm here because I have a client, and if Robinson had walked into that vote and announced to the committee, hey, my client was involved in the preparation of this resolution, it would benefit them, I'm disclosing that before I vote, would we be here today? No, we wouldn't because he wouldn't. So does that not just mean that it's an ethics violation by the official? It doesn't because when he appears before the AEMC, for example, he says point blank, I'm here to protect my constituents. And so he is there, and government's exhibit number one, the letter drafted for him by Mr. Gilbert, that explains that he is there because he believes it is his duty as a state legislator to make this appearance before the AEMC. And I think it's really important to focus on the facts and the allegations of what the EPA is considering here, which is that the environmental issues that we're talking about, this isn't contamination in some remote area of the district. This is soot that is allegedly causing widespread public health problems, depositing arsenic, lead, and carcinogens on everybody's doorsteps, which is to say that these are allegations affecting thousands of people, and exactly the sort of thing somebody would expect a state legislator to know. And indeed, Anne heard one of the administrators for the EPA testify. That's exactly why a state legislator's word carries weight. And the EPA, under the relevant Superfund statutes, is required to consult with the state and provide substantial and meaningful involvement. And so all of this shows that Oliver Robinson has a unique role to play, a special role, in convincing the EPA that his constituents believed the best approach was to focus on the one company that had already been held liable, Walter Coke, and to forego Superfund liabilities for the other corporations. Was there ever any meetings between Oliver Robinson and anybody at EPA, or between Robinson and anybody with the Alabama Commission? Mr. Robinson met both with officials at the EPA. That was in the December 2014, and he also met, he had a dinner with the chair of the AEMC, Lance LaFleur, in February, and he also made his appearance. And did they testify at the trial, those officials from those two agencies? Yes, they did, Your Honor. And in addition, Lance LaFleur, who is the head of ADEM, he was at this meeting with the AEMC, and he recognized that Oliver Robinson's role encompassed more than the simple asking of questions. He registered that Oliver Robinson was opposed to the EPA's actions in North Birmingham, and at a meeting later that spring with the EPA officials in Washington, D.C., Lance LaFleur planned to report that, because he recognized the state legislature's opinion on these matters is a relevant fact in the EPA's decision-making. Was there a pending matter before the AEMC when Robinson met with the group? Yes, there was, because there was the question of how exactly and what are the grounds that ADEM should adopt for opposing the EPA's actions in North Birmingham. But hadn't the director of ADEM already sent a formal letter stating ADEM's position to the EPA on January 8th? He had. However, the defendants, through contacts with the head of ADEM, Lance LaFleur, they were worried that he would, quote, Lance LaFleur would, quote, throw in the towel and that he was not very excited to oppose the EPA. And in fact, if we look at Government's Exhibit 175, these are the notes Lance LaFleur put together in preparation for a meeting with the EPA in the spring. One of the points he makes is that we want to be on the same side as the EPA. And he notes that the grounds that ADEM has for opposing the EPA's actions are different than those of the Attorney General. And I think it's important to note that what ADEM was doing was it was invoking its rights to appeal under the fields memo of the EPA. And so that's just the start of a lengthy process where ADEM has to make the case for why the EPA is wrong. And so the defendants wanted ADEM to get more involved to figure out what sites the EPA planned to get soil samples from. And the defendants opposed the air deposition theory that the EPA was advancing. But that wasn't part of ADEM's case. So there are a number of different grounds that ADEM was supposed to press. And AEMC as a supervising body has authority to pressure ADEM to do these things. For example, in October of 2015, AEMC receives a letter drafted by Mr. Gilbert for an organization called Get Smart Tarrant. Get Smart Tarrant takes the EPA and ADEM to task. The EPA for its, quote, egregious actions in Tarrant and ADEM for failing to do anything about it. Lance LeFleur receives a letter or an email from Lanier Brown, the chair of AEMC, in which Mr. Brown says that ADEM needs to be a strong advocate for its people and be more forceful. And Lance LeFleur responds and he shortly afterwards sends the EPA a letter reminding them of Alabama's opposition to their efforts and attaching SJR 97. And so these are the sorts of things that all work together and using that the defendants put together as part of their strategy. Can I just ask a question? Sure. Your opposing counsel argued that this theory that we hired him to do whatever needed to be done as the needs arose, that that was only in count one and not in count two. Isn't that what he, I thought that's what he was arguing. I think that that's what he asserted, but it's not correct. Why isn't it correct? All of these allegations about the retainer theory are incorporated into every count. And to look at the indictment and to consider this argument about the constructive amendment issue. And it says in there when you allege count two, we hereby reallege blah, blah, blah, blah, blah. Yes, it does. And when we give a common sense reading of this indictment, the indictment alleges that the bribery scheme runs from November 2014 to November 2016. And payments are being made all throughout that period. However, the three official acts simply occur from December 2014 to June of 2015. It doesn't make a whole lot of sense to say that this is a scheme that begins with bribes to attain three acts and then payments to reward Mr. Robinson for again committing those three acts. Instead, the more common sense reading is that this is a simple retainer agreement. And going back to the question about McDonnell and the sufficiency, it's important to recognize the question here isn't whether official acts were performed or not. Because that isn't, strictly speaking, the missing element that the defendants have to establish in a sufficiency challenge. They have to show that there is no evidence of an intent to obtain official acts. And so we get to look at other things such as the fact that there were other consultants working for the Drummond Company on these very issues. And they didn't know that Oliver Robinson was, in fact, one of their colleagues and engaged in outreach as a consultant. Instead, they just thought he was working there as a state legislator. And so when we consider the evidence as a whole, there's certainly enough for a reasonable juror to find that the defendants intended for Oliver Robinson to perform official acts. I'm a little confused on the official acts business. It's not part of the statute he was charged with, but you're hiring him to do something because of his legislative capacity. So when you say official acts, what do you mean? Do you mean official acts in the sense of the other statute, or do you mean something lesser? I don't understand what you mean. Sure. So in the jury instructions, we agreed with the defendants that we could define the honest services counts with reference to bribery that involves official acts as defined under Section 201. Now, in the indictment, we referred only to bribery as defined under Section 666. But we're happy to proceed under the theory that sufficiency of the honest services counts requires proof of an intent to influence official acts under 201. Okay. And going to the other question that was raised about McDonald and the advice jury instruction, the central challenge that the defendants are making here is that the definition of advice that was given in the instruction lacks a link to a formal exercise of governmental power. And that simply isn't the case because to convict under an advice theory, the jury had to find that the advice pertained to a formal exercise of governmental power. That is all that is required under McDonald. And this question about official duty that they raise, I think, cuts the other way because, as I pointed out before, government's exhibit number one was drafted by Joel Gilbert, and it uses the word duty. It says that as a state legislator, Oliver Robinson had a duty to appear before the AEMC and represent his voters. That, I think, reflects the ambiguity in official duty and whether it means official capacity or whether it means a formal requirement to provide advice. McDonald is explicit that advice can be given by an official who doesn't have such a formal requirement. And, indeed, the higher-up official is, for example, a senator or a governor. The less likely it is that that person is going to have a duty to provide advice, but the greater the interest in protecting that advice from political corruption. So tell me again what role the Alabama legislature played in determining whether or not the Superfund site was going to be placed on EPA's list. What role the state legislature had? Sure. I would say there are two principal roles. The first, the most obvious role, is whether they authorize funding for the 10% cleanup costs. So that, in theory, if things were to progress, they would have a bill and they would have a debate and they would have authority to vote on whether or not to authorize the state to spend 10%. But none of that ever took place. All we have here in this record is a resolution? That's right. In terms of legislative, but beyond that, as a legislator, Oliver Robinson also had the authority to vote on the budgets for all of the state environmental agencies that are involved here. And so that was another form of controller pressure. And again, as discussed, the role of a state legislator in the Superfund process is as somebody who can give advice, knowing or intending that these agencies would rely upon it because, as I think Anne Heard said, we look to legislators because they know about facts that people in Atlanta or people in Washington, D.C. aren't going to know. They know the day-to-day troubles of the people the EPA is trying to help. And as a Superfund lawyer, Joel Gilbert is aware of this. And so he is aware of the role that state legislators play, and the defendants thus can be charged with intending to influence these agencies through Oliver Robinson. How can anybody hire a part-time state legislator as a consultant and not run afoul of federal criminal laws? So if a person wants to hire a state legislator, and I guarantee you that in all these states with part-time legislators, they have consulting contracts, is the line that they can't meet with any government agencies? Is the line that there has to be something in the agreement that says the legislator will disclose before any such meetings that the legislator is acting in a private capacity? How can these consulting agreements exist and not run afoul of federal criminal law? I think disclosure is generally the key, Your Honor. And it's going to be – I don't think we'd be able to draw a bright line. As McDonald says, these are going to be fact-specific, fact-intensive determinations about whether somebody is acting in official capacity or not. But here we can look at all of the secrecy that was taken to ensure that nobody outside of the defendants and Oliver Robinson knew that he was actually working as a state legislator – or excuse me, as a lobbyist for the Drummond Company rather than as a state legislator. I see that I'm getting close to running out of time, so I wanted to just briefly discuss the severance-slash-mistrial issue if I can. Thank you. So, as we said, this motion for a mistrial occurred near the end of the government's case. And to allow Mr. Roberson a new trial in these circumstances, they have to show compelling prejudice and they have to show that these three redacted statements were exculpatory and substantially so. But they can't do that because we don't even know when the advice that they refer to was given. They claim that the advice was – that the timing of this advice is irrelevant, but it's actually dispositive because the Mike Hubbard trial occurred in the summer of 2016. And so if this advice was given at that time, it just came too late to provide any basis for a good faith. I see that I'm out of time now. Thank you. We have your argument. Thank you, Mr. Krishna. We'll hear from Mr. Roth again. Thank you. Your Honors, I think the exchange between Judge Branch and counsel for the government was quite instructive. If the problem here was lack of disclosure, this is not a federal bribery charge because the Supreme Court has made clear in Skilling and other cases, these statutes are not about disclosure. Disclosure and disclosure requirements are an issue for state regulation. That's not the province of the federal bribery statutes. With that said, I'd like to just briefly address this key issue of advice. If he were voting on something, I don't think disclosure solves the problem. I agree, Your Honor. I completely agree. And that's what proves that these two meetings were not official acts. He could not have been bribed to take those acts because a vote, sure, if you disclose you've been bribed to take a vote, you're going to be indicted immediately. But if you can go to this meeting and say, just so you know, I have a contract with Drummond and cure the problem, I think that proves that the first two acts were not official. What they were is within the McDonnell framework, this dichotomy. Well, there is a deception. You go and you argue as if you are representing your constituents, but you're arguing for a specific client. It's telling the other people in the meeting something different. Right. I agree, Your Honor. It was deceptive in that respect. That does not mean that it was an official act. It does not mean it was bribery. And I would just point the court to this critical distinction that McDonnell drew between using your office to provide advice, which is official, and expressing support for an action. What the Supreme Court said is not official. Now, we think these two first meetings did not cross that line as a matter of law, but certainly the jury had to be told that that was the line. And the jury was never told that expressing support for an action is not official action within the meaning of McDonnell. We asked for it. It's a direct quote from the Supreme Court's decision, and it was omitted, and that was the critical line in this case with respect to these first two acts. As a result of that omission, the jury could well have found that all Robinson did with the EPA or at the commission hearing was express support, express a policy position, and convicted on that ground, even though as a matter of law that is not enough to ground a federal bribery conviction. Even though we've got Robinson testifying that I considered it a bribe, it was a bribe? Your Honor, he said that he considered it a bribe in exchange for using his influence as a legislator to talk to people about the EPA issues. Talking to people about issues within the meaning of McDonnell is not official action. It is at most expressing support, and certainly a properly instructed jury could have found that it was just expressing support had they ever been told that that was the line. And I would just refer, Your Honors, to the Van Buren decision from this court from a few months ago where the court ordered a new trial because the jury had not been told the examples that McDonnell gave. And this court said that was enough to require a new trial because without the examples, the jury might not have appreciated what a matter was. Here, what was omitted was an important substantive parameter of official action that expressing support does not cross the line. It was critical to the defense case with respect to these first two acts, the only two that were ever discussed with the defendants. And as a result, the jury may well have convicted on grounds for conduct that is not unlawful under the statutes. We have your argument, Mr. Roth. Thank you. And we'll hear from Mr. Das. Briefly, in response to the government, concerning the constructive amendment of the indictment, the cross-incorporation reference doesn't cure this problem with the way this indictment is charged. Merely stating at the beginning of count two that all preceding allegations are incorporated does nothing to change the way this substantive count is charged. It's the specific statutory language followed by a that is and three items and only three items. But what the district court did was add a fourth option for the jury to convict on. That runs afoul of this court's precedent. In terms of the advice jury instruction and its link to official duty. As I hear the government's argument today, they claim the government that the evidence should have supported that Oliver Robinson was acting consistent with his duty. But the problem here is the jury was never told that that was a key consideration for whether the advice is sufficient for purposes of official action. The evidence was not so undisputed as the government suggests. There was evidence to the contrary, suggesting that this had nothing to do with his official duties as a legislator. For that reason, there's a real risk that innocent conduct was captured by the district court's jury instructions. Thank you. Thank you, Mr. Doss. Mr. Haspel, you've reserved some time. Thank you, Your Honor. The government suggests we have to show compelling prejudice, and we do. It is the only evidence of direct personal reliance on the advice of counsel that exists in this case. That was blocked by Mr. Gilbert, so we were not able to present that. The government capitalized on that in its rebuttal closing argument. It specifically said there is no evidence of personal reliance in this case. That's what they told the jury in closing. Now the government suggests that the 302 report that reflects that my client consulted with Mr. Gilbert, who told him he had also talked to Buttress and Pilcher about ethical issues. There's some timing problem here that vitiates my argument. I suggest that's obviously not true. We don't know whether the 302 was topical or sequential. But in any event, at any point in the relationship with the Oliver Robinson Foundation that my client was interested in ethical issues and sought the advice of counsel shows that he was relying in good faith on that advice. Thank you very much. Let me ask you a question. As I read the briefs, I thought the main argument was leaving these things out was misleading. Yes. Because this was a piece of hearsay, and if you're going to get it in, it's because it's misleading if you put the first parts in and not the second parts. I thought that was the main argument. Well, that's part of the argument. Clearly it was admissible hearsay under Rule 106. It completed the thought that Mr. Robinson had ethical concerns at some point during the relationship and how he addressed those concerns was what the omitted three sentences related to. And he obviously did that by consulting with the lawyer and asking for his advice. Thank you, Mr. Haswell. Thank you. Thank you, counsel. We will move to the next case.